UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| BRETT PETERSON,<br><br>Plaintiff,<br><br>v.<br><br>MICHELE MYERS, in her official capacity as Mayor of Crescent City, Florida, and in her individual capacity; H.D. DELOACH, in his official capacity as Sheriff of Putnam County, Florida, ALEX MILLIGAN SHARP, in his personal capacity, NORTHEAST FLORIDA NEWSPAPERS, LLC, d/b/a PALATKA DAILY NEWS, a Georgia business entity, SARAH CAVACINI, THE CITY OF CRESCENT CITY, FLORIDA, JOHN/JANE DOES 1-10 (fictitious individuals), and ABC ENTITIES 1-10 (fictitious entities),<br><br>Defendants. | Case No.: 3:22-cv-90 |

## COMPLAINT AND DEMAND FOR JURY TRIAL
## INJUNCTIVE RELIEF SOUGHT

Plaintiff, BRETT PETERSON (hereinafter, "Plaintiff" or "Peterson"), by and

through his undersigned attorney, sues Defendants, MICHELE MYERS, in her

official capacity as Mayor of Crescent City, Florida, and in her individual capacity;

H.D. DELOACH, in his official capacity as Sheriff of Putnam County, Florida, ALEX

MILLIGAN SHARP, in his personal capacity, NORTHEAST FLORIDA

NEWSPAPERS, LLC, d/b/a PALATKA DAILY NEWS, a Georgia business entity, SARAH CAVACINI, THE CITY OF CRESCENT CITY, FLORIDA, JOHN/JANE DOES 1-10 (fictitious individuals), and ABC ENTITIES 1-10 (fictitious entities) (hereinafter collectively, the "Defendants"), and avers as follows:

## NATURE OF THE ACTION

1.      This is a federal civil rights case pursuant to 42 U.S.C. § 1983 and under the Fourth Amendment of the United States Constitution as applied to the states under the United States Constitution's Fourteenth Amendment for the Defendants' individual and collective personal, malicious, and unlawful violations under color of state law of Plaintiff's individual rights.

2.      Defendants committed these unlawful violations of Plaintiff's constitutional and state rights under color of state law in bad faith and with malicious purpose in reckless, wanton, and willful disregard of Plaintiff's human and safety rights.

3.      The Plaintiff is also seeking state law claims related to these federal claims that form a part of the same case or controversy, under this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

4.      Plaintiff seeks relief, including declaratory and injunctive relief, compensatory damages, punitive damages, costs, and attorney's fees, pursuant to 42 U.S.C. § 1988 and Florida state law.

## PARTIES

5.      Plaintiff is a natural person residing in Putnam County, Florida. At all

times relevant to this action, Plaintiff was a resident of Putnam County, Florida.

6. Upon information and belief, Defendant Michele Myers (hereinafter, "Myers") is the Mayor of Crescent City, Florida, and is also a natural person residing in Putnam County, Florida. At all times relevant to this action, Defendant Myers was a resident of Putnam County, Florida.

7. Upon information and belief, Defendant H.D. DeLoach (hereinafter, "DeLoach") is the Sheriff of Putnam County, Florida, and is also a natural person residing in Putnam County, Florida. At all times relevant to this action, Defendant DeLoach was a resident of Putnam County, Florida.

8. Upon information and belief, Defendant Alex Milligan Sharp (hereinafter, "Sharp"), is a lawyer who is apparently also a deputy with the Putnam County Sheriff's Office and is also the president of the Putnam County Bar Association. At all times relevant to this action, Defendant Sharp was a resident of Putnam County, Florida.

9. Upon information and belief, Defendant Northeast Florida Newspapers, LLC (hereinafter, "Palatka Daily News") is a Georgia business entity whose principal address is 2365 Prince Ave., Suite A, Athens, GA 30601, and whose primary business occurs in the State of Florida. Defendant Palatka Daily News operates in Florida under a registered Florida trademark as the Palatka Daily News.

10. Upon information and belief, Defendant Sarah Cavacini (hereinafter, "Cavacini") is a natural person residing in Putnam County, Florida, working as a reporter for Defendant Palatka Daily News. At all times relevant to this action,

Defendant Cavacini was a resident of Putnam County, Florida.

11.     Upon information and belief, Defendant City of Crescent City, Florida (hereinafter, "Crescent City") is a political subdivision of the State of Florida with the capacity to sue and be sued.

12.     Upon information and belief, Defendants, John/Jane Does 1-10 (fictitious names) and ABC Entities 1-10 (fictitious entities), are believed to be individuals or entities whose actions or omissions contributed in some relevant and material way to the causes of action complained of herein. Plaintiff does not presently know the true identities of these Defendants, but will seek leave to amend the Complaint to properly name these Defendants after conducting discovery, should the need arise

## VENUE AND JURISDICTION

13.     Venue is proper in the Middle District Court of Florida, pursuant to 28 U.S.C. § 1391(b) and M.D. Fla. Loc. R. 1.02 (c), and Defendants' independent and collective malicious and unlawful violations under color of state law of Plaintiff's constitutional rights giving rise to the claims herein accrued within this district and division, as all Defendants work, reside, and/or do business in this district and division, and all of the acts and omissions giving rise to this action occurred in Putnam County, which is in this district and division.

14.     The Court has subject-matter jurisdiction over the Plaintiff's federal law claims, pursuant to 28 U.S.C. §§ 1331 (federal question), and 1343(a)(3) (civil rights).

15.     Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and

2202, as well as Federal Rule of Civil Procedure 65.

16.    This Court also has supplemental jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367(a).

17.    At all material times, the Defendants committed these unlawful violations under color of state law in bad faith and with malicious purpose in reckless, wanton, and willful disregard of the Plaintiff's human and safety rights.

18.    These constitutional law violations are "capable of repetition, yet evading review." Roe v. Wade, 410 U.S. 113, 125 (1973) (citing Southern Pacific Terminal Co. v. ICC, 219 U. S. 498, 515 (1911), Moore v. Ogilvie, 394 U. S. 814, 816 (1969), Carroll v. Princess Anne, 393 U. S. 175, 178-179 (1968), United States v. W. T. Grant Co., 345 U. S. 629, 632-633 (1953)).

19.    All conditions precedent to the maintenance of this action have been performed, have occurred prior to its institution or have been waived.

## FACTS COMMON TO ALL COUNTS

### A.    A BRIEF EXPLANATION OF HOW GOOGLE ACCOUNTS WORK

20.    Millions of Americans use Google Accounts to manage their emails, login information, and other linked accounts, like YouTube.

21.    Whenever anyone goes to the Gmail website in order to retrieve their mail, by logging into that site, by logging into Gmail, they also automatically log into their Google Account, which stores their passwords, as well as their browsing history.

22.    Often, Google Accounts are set to stay logged in, in order to make it

easier for the user to return to often-used websites without having to re-log in every time they use them.

23.     However, one of the most useful aspects of Google Accounts are that a person can log into their account from any location, whether on a computer, phone, or other smart device.

24.     This enables the user to essentially pick up where they last left off, regardless of computer.

25.     On the other hand, since the Google Account information is stored by Google in the "cloud", **nothing is actually on the computer itself**.

26.     Essentially, once a person logs out of the computer, access to any of the passwords, browsing history, etc., leaves no trace on the computer.

27.     However, if a person leaves a Google Account signed in, and another person accesses that account while still logged in, that intruder – should they go looking for it – will have access to the person's passwords, search and browsing history, credit card numbers, banking information, location data, etc.

### B.     THE FACTS OF THE INSTANT CASE

28.     On November 5, 2020, Myers unseated the Plaintiff as mayor of Crescent City in an election.

29.     It was a contentious election, and since the Plaintiff had only served one term at that point, it was likely that he would attempt re-election and be campaigning against Myers in the future.

30.     However, during the months after the election, Myers realized that the

computer assigned to the mayor's office was still logged into the Plaintiff's Google Account.

31.    The right thing to do in such a situation would have been for Myers to log out of Plaintiff's Google Account.

32.    Instead, Myers – either on her own or through agents working on her behalf – opportunistically elected to access the Plaintiff's Google Account, going so far as to assemble a spreadsheet of all of Plaintiff's personal online usernames and passwords.

33.    Having complete and unfettered access to Plaintiff's personal online accounts, Myers went on a six-month long fishing expedition for ill-gotten information on the Plaintiff's personal life which might serve to give her a political advantage.

34.    In addition, during early 2021, the Plaintiff was speaking out in the media against the Mayor and Sheriff's Office's plans to eliminate the Crescent City Police Department and outsource law enforcement to the Putnam County Sheriff's Office, at a cost to the taxpayers of approximately $490,000.00 per year.

35.    On April 5, 2021, Myers, along with interim City Manager Phil Leary and City Attorney Jay Asbury, directed the Putnam County Sheriff's Office to perform a forensic analysis of the subject computer. See, *Putnam County Sheriff's Office FIBRS Incident Report*, attached hereto as **Exhibit "A"**, p. 1, ¶ 1 (hereinafter, the "Forensic Report").

36.    Notably, the "reporting officer" in the Forensic Report was Defendant Alex Milligan Sharp.

37.    The reasoning given behind the search was based upon the alleged concerns that, "confidential information was being accessed off the Mayor's work computer and then leaked." **Ex. "A"**, p. 1, ¶ 2 – p. 2, ¶ 1.

38.    Importantly, it should be noted that this forensic analysis was not performed pursuant to any warrant, nor in furtherance of any articulable suspicion or probable cause.

39.    Rather, the analysis was performed as a result of Myers's disingenuous worries that the computer was being accessed remotely by Plaintiff – her concocted explanation for the fact that the Plaintiff's account was still logged into the computer six months after his having left office.

40.    The Forensic Report concluded that "no pornography or images of a sexual nature" were present on the computer, and Sharp was, "not able to establish any illegal activities involving this computer." **Ex. "A"**, p. 3, ¶¶ 2 – 4.

41.    However, at the point during the forensic analysis at which it was determined that the computer was not, in fact, being accessed remotely, the investigation should have concluded.

42.    Determining whether the computer was being accessed remotely, was, after all, the very pretense – albeit false – upon which Myers requested the analysis in the first place.

43.    Therefore, upon determining that the computer had <u>not</u> been accessed remotely, no further investigation was necessary and certainly no probing into Plaintiff's personal online accounts should have occurred.

44.    But the Putnam County Sheriff's Office did not stop. Rather, they invaded Plaintiff's privacy further by searching Plaintiff's private browser history.

45.    In so conducting this warrantless forensic analysis on the subject computer, the Putnam County Sheriff's Office was acting solely at the behest of Myers, essentially becoming a dirt-digging tool in her political arsenal.

46.    However, contrary to Sharp's conclusions, the computer search <u>did</u> find conclusive evidence of criminal activity, as it showed that at 11:32am on March 24, 2021, someone created a folder titled "Peterson Computer" which contained an Excel spreadsheet of the Plaintiff's passwords (hereinafter, the "Excel Document") and an image filed titled "Google Chrome Screen capture". **<u>Ex. "A"</u>**, p. 2, ¶ 6.

47.    It also showed that the Excel Document was created moments later, at 11:33am on March 24, 2021, and contained, "a list of websites, usernames, and passwords associated with Peterson." **<u>Ex. "A"</u>**, p. 3, ¶ 1.

48.    As the author of the Forensic Report, Alex Sharp explained:

> This is a feature of Google, where you can export all user names and stored passwords from the Google Chrome web browser.

**<u>Ex. "A"</u>**, p. 3, ¶ 1.

49.    Notably, on March 24, 2021, the Plaintiff had been out of office for months, and it would have been physically impossible for him to create either the "Peterson Computer" folder or the Excel Document.

50.    It could only have been Mayor Myers who created the "Peterson Computer" folder and the Excel Document, as she was the sole user authorized to use

that computer on March 24, 2021.

51.     The fact that this invasive deep-dive into Plaintiff's personal online accounts was politically motivated is further evidenced by what happened next, once the forensic audit was finished: the findings were published in a report which was made available to the public.

52.     As a result of the release of this report to the public, an article was published on May 11, 2021, both in print and online, in the Palatka Daily News, a publication operated by Defendant Northeast Florida Newspapers, LLC (hereinafter, "Defendant Palatka Daily News").

53.     The article (a true and correct copy of which is annexed hereto as Exhibit "A"), which remains available on Defendant Palatka Daily News's website, was authored by reporter Defendant Sarah Cavacini, and bears the headline, "**PORN SITES PUT CRESCENT CITY ON ALERT**," followed by the subheading, "**AUTHORITIES LINK FORMER MAYOR'S EMAIL, PASSWORD TO ADULT SITES ON OFFICE COMPUTER**".

### C. <u>THE FOURTH AMENDMENT'S APPLICATION TO GOOGLE ACCOUNTS.</u>

54.     The Fourth Amendment bars unreasonable searches and seizures.

55.     In describing the Fourth Amendment as a protection of people and not places, the U.S. Supreme Court has stated that what a person "seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." <u>Katz v. United States</u>, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

56.     A government intrusion into a person's private sphere qualifies as a "search," triggering the Fourth Amendment requirement that the intrusion be authorized by a warrant supported by probable cause, when that person " 'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable.' " Carpenter v. United States, —— U.S. ——, 138 S. Ct. 2206, 2213, 201 L.Ed.2d 507 (2018), *quoting* Smith v. Maryland, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979).

57.     The Supreme Court also has recognized that an intrusion need not be "trespassory" to be considered a search for Fourth Amendment purposes. *See*, United States v. Jones, 565 U.S. 400, 412-13, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012) (affirming court of appeals decision that required a warrant for a search that tracked an individual's movements for 28 days with global positioning technology); *see also*, Matter of Search of Info. Stored at Premises Controlled by Google, 481 F. Supp. 3d 730, 734 (N.D. Ill. 2020).

58.     Essentially, the moment that Sharp accessed the Plaintiff's Google Account, he was not "searching" the mayor's computer anymore, but rather, was *accessing data stored on Google's corporate servers under the Plaintiff's name and password*.

59.     Such a search requires a warrant aimed at Google and/or the Plaintiff, rather than at the physical computer in question, because the information was not stored on the computer at all.

60.     One comparison might be to a law enforcement officer finding a housekey in a public place, and then using that key to conduct a warrantless search of

the person's house. Carelessness with a housekey or a password is not license to steal a house or a person's bank account information, nor is it anything that would authorize a warrantless search.

## COUNT I
## TORTIOUS INVASION OF PRIVACY – INTRUSION
### Common Law
### (Defendants Michele Myers, Alex Sharp, and H.D. DeLoach)

61.     Plaintiff, BRETT PETERSON, repeats and reavers each and every allegation of paragraphs 1 through 60 as though fully set forth herein.

62.     To preface, Florida law recognizes four unique causes of action which fall under the umbrella tort of "invasion of privacy", including (1) appropriation—the unauthorized use of a person's name or likeness to obtain some benefit; (2) intrusion—physically or electronically intruding into one's private quarters; (3) public disclosure of private facts—the dissemination of truthful private information which a reasonable person would find objectionable; and (4) false light in the public eye—publication of facts which place a person in a false light even though the facts themselves may not be defamatory. Allstate Ins. Co. v. Ginsberg, 863 So.2d 156 (Fla. 2003) (citing, Agency Health Care Admin. v. Associated Indus. of Fla., Inc., 678 So. 2d 1239, 1252 n.20 (Fla. 1996)).

63.     Here, Defendants Myers, Sharp, and DeLoach, individually and collectively, have tortiously invaded upon Plaintiff's privacy by intrusion into Plaintiff's private quarters through both physical and electronic means.

64.     Defendant Myers herself physically intruded into Plaintiff's private

Google Account and various other online accounts belonging to the Plaintiff, going so far as to amass a spreadsheet of Plaintiff's personal usernames and passwords.

65. This is tantamount to misappropriating someone's Social Security Number or the PIN for their debit card and would have required extensive and intrusive probing into Plaintiff's online accounts to obtain this information.

66. Therefore, Defendant Myers not only intruded upon Plaintiff's private online quarters by compiling his personal login credentials, but also by digging through Plaintiff's online accounts themselves in order to obtain those login credentials as well as any other politically advantageous Myers could find.

67. Further, Defendant Myers – *under a pretense which she knew to be false* – directed the Putnam County Sheriff's Office, and specifically Sharp under the guidance of DeLoach, to utilize further physical and electronic means of intruding into Plaintiff's private online quarters, namely, through a forensic analysis of the computer.

68. Admittedly, the computer itself it not the property of the Plaintiff, and therefore, if Myers, Sharp, and DeLoach had merely confined their forensic analysis to the computer's hard drive to determine whether the computer was being accessed remotely by Plaintiff – as was their *purported* reason for conducting the analysis in the first place – said Defendants arguably would not have intruded upon Plaintiff's private quarters.

69. However, even after determining that Plaintiff was not, in fact, accessing the computer remotely, Myers, Sharp, and DeLoach proceeded to search Plaintiff's personal online browser history stored at Google – a history only made accessible to

them by virtue of the fact that Plaintiff had inadvertently stayed logged into his Google Account on the computer prior to leaving office.

70.    To search through Plaintiff's personal online browser history – information which they had no legal right to access, particularly given that this search was conducted without a warrant – was a clear intrusion into Plaintiff's private online quarters.

71.    Further, while publication of the findings of such an intrusion are not a necessary element of the intrusion itself, here, the ill-gotten fruits of Defendants Myers, Sharp, and DeLoach's tortious search were released to the public and subsequently reported on in the media. *See,* Oppenheim v. I.C. System, Inc., 695 F.Supp.2d 1303, 1309 (M.D. Fla. 2010).

72.    As caselaw, both in Florida State court and in the Middle District, has made clear, in analyzing invasions of privacy premised upon intrusion into one's private quarters "the focus of the tort is nonetheless 'the right of a private person to be free from public gaze.'" Id. (*citing* Ginsberg, *supra*. 863 So.2d at 162).

73.    Further, to constitute an invasion of privacy, the intrusion must be highly offensive to a reasonable person. Stoddard v. Wohlfahrt, 573 So.2d 1060, 1062-63 (Fla. 5th DCA 1991).

74.    It is clear that as a direct and proximate result of the tortious conduct of Defendants Myers, Sharp, and DeLoach as alleged, that said defendants directly subjected Plaintiff's private online activities – information which was password-protected and, thus, clearly intended to be private – to public scrutiny.

75.     Given the highly sensitive, personal, and private nature of Plaintiff's online conduct – particularly the collection of Plaintiff's online usernames and passwords by Defendant Myers and the searching of Plaintiff's private browser history by Myers, Sharp, and DeLoach – such an intrusion would undoubtedly be offensive to a reasonable person.

**COUNT II**
**TORTIOUS INVASION OF PRIVACY –**
**PUBLIC DISCLOSURE OF PRIVATE FACTS**
**Common Law**
**(Defendants Michele Myers, Alex Sharp, H.D. DeLoach, Northeast Florida**
**Newspapers, LLC, d/b/a Palatka Daily News, and Sarah Cavacini)**

76.     Plaintiff, BRETT PETERSON, repeats and reavers each and every allegation of paragraphs 1 through 60 as though fully set forth herein.

77.     As articulated previously, Florida law recognizes the public disclosure of private facts – in other words, the dissemination of truthful private information which a reasonable person would find objectionable – as a separate cause of action arising under the umbrella tort of "invasion of privacy". Ginsberg, *supra*.

78.     Here, Defendants Myers, Sharp, DeLoach, Palatka Daily News, and Cavacini, individually and collectively, have tortiously invaded upon Plaintiff's privacy by publicly disclosing private facts concerning the Plaintiff – namely, the contents of Plaintiff's private online browser history.

79.     As a recent case in the Eleventh Circuit, Hunstein v. Preferred Collection and Management Services, Inc., explained, "Under [invasions of privacy based upon the public disclosure of private facts], '[o]ne who gives publicity to a matter concerning

the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public.'" --- F.4th ----, 2021 WL 4998980 (11th Cir. Oct. 28, 2021) (*citing Restatement (Second) of Torts* § 652D (1977)).

80.    Further, regarding the publicity component – in other words, the *public disclosure* of the private facts – "publicity of the sort that underlies the tort of public disclosure of private facts entails communication... which in turn requires 'that one person has brought an idea to the perception of another.'" Id. (*citing Restatement (Second) of Torts* § 652D (1977) and *Restatement of Torts* § 559, Comment a, p. 140 (1938)).

81.    Addressing this publicity requirement first, it is clear given the facts underlying this matter, that following the April 2021 forensic audit of the computer formerly utilized by Plaintiff, the contents of Plaintiff's private online browser history were released to the public by Defendants Myers, Sharp, and DeLoach.

82.    Evidence of the fact that Defendants Myers, Sharp, and DeLoach released this information to the public is inherent in the fact that the Defendant Cavacini was able to report on it in the Palatka Daily News.

83.    The initial disclosure to the public through the release of the audit's findings by Defendants Myers, Sharp, and DeLoach and the subsequent publication of these findings by Defendants Cavacini and the Palatka Daily News were independent invasions of the Plaintiff's privacy as they were two independent disclosures.

84.     As previously alleged, the disclosure to the public of the contents of Plaintiff's private online browser history – information which was password-protected and, thus, clearly intended to be private – is a disclosure the nature of which would be highly offensive to a reasonable person.

85.     Such disclosures are tantamount to doxing, however, whereas doxing typically involves the publication of personal identifying information, which is already in the public domain, such as an individual's home address or telephone number, here, Defendants disclosed highly sensitive and highly confidential facts which were wholly not accessible to the public but-for the publicity given them by the aforesaid Defendants.

86.     Finally, the information disclosed was not at all a matter of public concern, given that it did not relate to any matter of "political, social, or other concern to the community." Connick v. Myers, 461 U.S. 138, 146 (1983) (discussing "matters of public concern" within the First Amendment context).

87.     Just because Plaintiff is a former mayor, does not automatically make him a public figure.

88.     In fact, the Supreme Court of the United States held in Wolston v. Readers Digest Association, Inc., that, "The private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." 443 U.S. 157, 167 (1979).

89.     Accordingly, the proposition that any private citizen who, at one time held public office, by virtue of that fact, waives their reasonable expectation of privacy

in their private online internet browsing, is wholly unreasonable, unethical, and unjust.

90.   Therefore, the private contents of Plaintiff's personal internet browser history, as a private citizen, are of no consequence to the public.

91.   This is especially so, given that the contents of that browser history – which were, in fact, accessed by Plaintiff solely from his home computer – were only then viewable by the aforesaid Defendants on the subject computer because of Plaintiff inadvertently staying logged into his Google Account on the computer after leaving office.

92.   Further, it is important to note that at the time the aforementioned disclosures were made, Plaintiff was no longer a public figure – having been out of mayoral office for over six months – and by Cavacini's own admission in her May 11, 2021, article in the Palatka Daily News, "the sheriff's office report did not find any evidence of illegal activities involving Myers' computer that Peterson, whom Myers defeated in the November general election, used during his time in office."

93.   Therefore, as a direct and proximate result of the tortious conduct of Defendants Myers, Sharp, DeLoach, Cavacini, and the Palatka Daily News, as alleged, said defendants wrongfully invaded into Plaintiff's private affairs by publicly disclosing the contents of his private online browser history – information which none of these defendants had a legal right to possess, let alone disseminate to the public.

<u>**COUNT III**</u>
<u>**TORTIOUS INVASION OF PRIVACY – FALSE LIGHT**</u>
**Common Law**
**(Defendants Michele Myers, Alex Sharp, H.D. DeLoach, Northeast Florida**

**Newspapers, LLC, d/b/a Palatka Daily News, and Sarah Cavacini)**

94.    Plaintiff, BRETT PETERSON, repeats and reavers each and every allegation of paragraphs 1 through 60 as though fully set forth herein.

95.    As articulated previously, Florida law recognizes publication of facts which place a person in a false light in the public eye as a unique cause of action arising under the umbrella tort of "invasion of privacy." Ginsberg, *supra*.

96.    Here, the tortious conduct of Defendants Myers, Sharp, DeLoach, Sharp, Palatka Daily News, and Cavacini, (referred to collectively in this Count as "the Defendants") as alleged elsewhere herein have done just that.

97.    For a plaintiff to recover under a theory of false light invasion of privacy, the false light must be highly offensive to a reasonable person, and the defendant(s) must have acted either knowingly or in reckless disregard as to the falsity of the publicized material and the false light in which it would be placed. Lane v. MRA Holdings, LLC, 242 F.Supp.2d 1205, 1221 (M.D. Fla. 2002). *See also*, Harris v. Dist. Bd. of Trs. of Polk Cmty. College, 9 F.Supp.2d 1319, 1329 (M.D. Fla. 1998).

98.    Just what constitutes the publicized material is exemplified in the May 11, 2021 article in the Palatka Daily News authored by Defendant Cavacini, and therefore, reproduced below is a screenshot of the article itself from the Palatka Daily New's website, located here: https://www.palatkadailynews.com/local-news/porn-sites-put-crescent-city-alert .

## Porn sites put Crescent City on alert

By Sarah Cavacini on Tuesday, May 11, 2021

Authorities link former mayor's email, password to adult sites on office computer



Former Crescent City Mayor Brett Peterson

99.    Although this image speaks for itself, to be clear, Defendants Cavacini and the Palatka Daily News authored and published, respectively, an article about Plaintiff bearing the heading, "Porn sites put Crescent City on alert," followed by the subheading, "Authorities link former mayor's email, password to adult sites on office computer."

100.    Specifically, Defendant Cavacini's article states in part that, "The Putnam County Sheriff's Office conducted an audit in early April because interim City Manager Phil Leary and Mayor Michele Myers, who currently uses the computer Peterson previously used, were worried 'confidential information was being accessed off the mayor's work computer and then leaked,' according to the agency's report." (*See*, Cavacini, Sarah, *Palatka Daily News*, "Porn sites put Crescent City on alert", May 11, 2021, attached hereto as **Exhibit "B"**).

101.   However, Defendant Cavacini's article also goes on to make clear that "the sheriff's office report did not find any evidence of illegal activities involving Myer's computer that Peterson, whom Myers defeated in the November general elected, used during his time in office." Id.

102.   This begs the question – then why report this at all? If no evidence of illegal activity by Plaintiff was found in connection with the subject computer, why go to the lengths of writing an article about it – an article that juxtaposes Plaintiff's pictures just below a scandalous and alarmist headline?

103.   It is important to keep this question in mind at all times when accessing the conduct of the defendants in this matter.

104.   And further, regarding the scandalous and alarmist headline itself – "Porn sites put Crescent City on alert" – neither the article, nor the Putnam County Sheriff's Office's report of the forensic audit of the computer produced any evidence that the adult websites were accessed by Plaintiff utilizing the computer or Crescent City's municipal office's network.

105.   That is because, as stated previously, Plaintiff *never* accessed adult sites from his office computer – the subject computer – rather, these sites were accessed by Plaintiff from his personal home computer, and by virtue of the fact that this online activity was stored in the browser history connected to Plaintiff's Google Account, when Plaintiff inadvertently left himself logged into his Google Account on the subject computer, the browser history became accessible to, and was, in fact, tortiously accessed by, Defendants Myers, Sharp, and DeLoach.

106.    But the Defendants knew this already. The Defendants each knew, or at the very least, should have known in light of the findings of the warrantless forensic audit performed on the subject computer that Plaintiff never accessed these adult sites from the computer itself.

107.    In fact, Defendant Cavacini's article explicitly goes on to quote the Plaintiff as saying, "At no point did I ever access anything like that at the office," and further, goes on to quote Putnam County Sheriff's Office's spokeswoman Allison Waters-Merritt as saying that "even if the sites were accessed at [Plaintiff's] home, the links still showed up on city computers…" (**Ex. "B"**).

108.    This is telling for two reasons: 1) It shows knowledge of those in possession of the Sheriff's Office's report – Defendants Myers, Sharp, DeLoach, and subsequently Cavacini and the Palatka Daily News – of the fact that there is no evidence indicating that Plaintiff accessed the adult sites from the subject computer; and 2) It shows that these defendants genuinely have no idea how a Google Account works.

109.    The fact that "the links still showed up on city computers" – (and the interesting use of the phrase "city computers" – "computer*s*" plural – by Ms. Waters-Merritt is something that will be discussed shortly) – only demonstrates that the defendants accessed Plaintiff's browser history associated with his Google Account as alleged, but the allegation that Ms. Waters-Merritt goes on to make, "And the adult websites could have put viruses on all Crescent City computers," is wholly incorrect.

110.    This is because, again, these sites were never accessed by Plaintiff

utilizing the computer or Crescent City's municipal office's network; rather, Plaintiff's Google Account merely creates a log of all URLs, i.e., "links" – this log being the "browser history" – of the sites accessed by Plaintiff while signed into his Google Account.

111.    Therefore, as the sites themselves were never accessed, never actually navigated to by Plaintiff utilizing the computer or Crescent City's municipal office's network, it is impossible for their mere presence in Plaintiff's browser history to "put viruses on all Crescent City computers".

112.    But again, the Defendants knew, or at the very least, should have known in light of the findings of the warrantless forensic audit performed on the subject computer that, given that there was no evidence to suggest that the Plaintiff actually accessed these adult sites from the computer itself or while using the municipal office's network, the potential for Plaintiff to put viruses on all Crescent City computers was <u>impossible</u>.

113.    So again, why report it?

114.    Returning for a moment to Ms. Waters-Merritt's quote that, "the links still showed up on city computers" – "computers" plural – this is interesting because it was *only* the subject computer that was utilized by Plaintiff, and it was *only* the subject computer that was logged into Plaintiff's Google Account at the time he left office.

115.    How then would "the links" – in other words, Plaintiff's private browser history – show up on multiple city computers?

116.   There are multiple explanations for this: 1) It is possible that Ms. Waters-Merritt simply misspoke, and meant only the subject computer, even though that is not what she said; or 2) It is also possible that someone – perhaps Defendant Myers, Sharp, or DeLoach, who had access to Plaintiff's login credentials – logged into Plaintiff's Google Account on numerous city computers in an attempt to incriminate Plaintiff.

117.   Given this ambiguity, again, why report this at all?

118.    I proffer a third possibility for Ms. Waters-Merritt's statement, and for the tortious conduct of the Defendants, as herein alleged, overall: the entire chain of events – the collection of Plaintiff's private login credentials by Myers, the warrantless forensic audit of the subject computer by Sharp and DeLoach at Myers's behest, the further probing by Myers, Sharp, and DeLoach of Plaintiff's private browsing history, the subsequent release of the audit's findings to the public, and the subsequent authoring and publication of the afore-referenced article by Cavacini and the Palatka Daily News, respectively – all of it, was intended to place Plaintiff in a false light in the eyes of the public that would be highly offensive to a reasonable person.

119.   While it is true that Defendant Cavacini's article makes specific mention of the fact that no evidence of a crime having been committed by Plaintiff was found, the mere publication of the article and its contents are clearly intended to create the implication of wrongdoing, corruption, or immorality on Plaintiff's part, solely for the purpose of casting him in a false light as this would be politically advantageous to Defendant Myers as the incumbent Mayor of Crescent City, should Plaintiff ever

decide to seek reelection.

120.    Given that porn viewership has increased dramatically in the United States recently, particularly as a result of the pandemic, according to a multitude of online studies and news reports, it appears obvious based upon not only the contents of Defendant Cavacini's article, but the fact that these contents are either wholly without merit, ambiguous, or misleading as explained, that the very purpose of the article and the Putnam County Sheriff's Office's report upon which it was based, was to levy unfounded accusations at Plaintiff and create a sense of doubt about his moral character by including details that serve no purpose other than to unethically liken him, in the minds of the reading public, to the porn-addicts and chronic masturbators of the world.

121.    Put simply, the publication of *anyone's* private online browser history to the public, whatever its specific contents, but especially when that private browser history contains sensitive content such as adult sites, would surely be highly offensive to any reasonable person, and this is especially so when the person in question is a former holder of public office.

122.    Surely, any of the Defendants would find the publication of *their* private internet browser history to the public highly offensive, and the subsequent alarmist (and unfounded) implications of wrongdoing, corruption, or immorality by Plaintiff such that Crescent City was "put... on alert" only serve to heighten the highly offensive nature of the false light into which Plaintiff was put but the tortious conduct of the Defendants as alleged.

123.    Further, and as previously articulated in this Count, it is alleged that the Defendants all acted not only knowingly, as is required for Plaintiff to maintain a cause of action under false light invasion of privacy, but intentionally; however, in the alternative, it is clear that the Defendants at the very least acted with reckless disregard as to the falsity of the publicized material and the false light in which it would place Plaintiff.

124.    As a direct and proximate result of the tortious conduct of Defendants Myers, Sharp, DeLoach, Cavacini, and the Palatka Daily News, as alleged, such tortious conduct constituting false light invasion of privacy, Plaintiff was, in fact, placed in a false light in the eyes of the public and has suffered significant damages, including reputational injury, as a result.

## COUNT IV
## DEFAMATION
### Common Law
**(Defendants Michele Myers, Alex Sharp, H.D. DeLoach, Northeast Florida Newspapers, LLC, d/b/a Palatka Daily News, and Sarah Cavacini)**

125.    Plaintiff, BRETT PETERSON, repeats and reavers each and every allegation of paragraphs 1 through 53 as though fully set forth herein.

126.    Defendants Michele Myers, H.D. DeLoach (hereinafter, "DeLoach"), Northeast Florida Newspapers, LLC, d/b/a Palatka Daily News (hereinafter, the "Palatka Daily News"), and Sarah Cavacini (referred to collectively in this Count as "the Defendants") have all defamed the Plaintiff, whether through their individual acts of slander or libel.

### The Elements of Defamation, Generally

127.   Florida law maintains that the elements of defamation generally are:

    a.   publication without privilege

    b.    of a false and defamatory statement concerning another;

    c.   without reasonable care as to the truth or falsity of those statements;

    d.   resulting in actual damages to that person.

Jews For Jesus, Inc. v. Rapp, 997 So.2d 1098, 1106 (Fla. 2008).

128.   As for the degree of fault required under Florida law in order for a private individual to recover actual damages, "the appropriate standard after Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974)], is negligence – i.e., publication of false and defamatory statements without reasonable care to determine their falsity." Boyles v. Mid-Florida Television Corp., 431 So.2d 627, 634 (Fla. 5th DCA 1983), affirmed, 467 So.2d 282 (Fla. 1985). *See also*, Cape Publications, Inc. v. Teri's Health Studio, Inc., 385 So.2d 188 (Fla. 5th DCA 1980).

129.   The Defendants each published without privilege false and defamatory statements concerning the Plaintiff without reasonable care as to the truth or falsity of the statements, resulting in actual damages to Plaintiff.

130.   As a threshold inquiry, "determining liability in a defamation case turns on whether the libeled party is a public or private figure and on whether the defamatory publication addresses a public or a private concern." Silvester v. American Broadcasting Companies, Inc., 839 F.2d 1491 (11th Cir. 1988).

Private Figure v. Public Figure v. Limited Public Figure & Fault

131.    Although it is maintained that Plaintiff was a private figure at the time the defamatory statements of the Defendants were communicated, as Plaintiff was already out of public office for a period of six months by the time the Putnam County Sheriff's Office's report was published and Defendant Cavacini's article, which itself was based on that report, was also published, meaning that Plaintiff was once again a private citizen as opposed to a public figure, even if we assume *arguendo* that Plaintiff was a public figure, Plaintiff can still maintain an action for defamation based upon the facts as they presently exist.

132.    It is well-settled that the free speech and free press guarantees of the First Amendment to the United States Constitution, as made enforceable against the states under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, "require ... a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." New York Times Co. v. Sullivan, 376 U.S. 254, 279–80 (1964).

133.    This First Amendment rule also applies to a public figure. Curtis Publishing Co. v. Butts, 388 U.S. 130, 162–65, (1967) (Warren, C.J., concurring, joined by four justices), as further explained in Gertz, *supra*.

134.    However, as Gertz made clear, there are two types of public figures:

> Some [plaintiffs] occupy positions of such persuasive power
> and influence that they are deemed public figures for all
> purposes. More commonly, those classes as public figures

> have thrust themselves to the forefront of *particular* public controversies in order to influence the resolution of issues involved.

<u>Gertz</u>, *supra.*, 418 U.S. at 345. (Emphasis added).

135.  This latter type of plaintiff – those that thrust themselves to the forefront of particular public controversies in order to influence the resolution of issues involved – are known as limited public figures. <u>Silvester</u>, *supra.* 839 F.2d at 1494.

136.  Clearly here, Plaintiff did not thrust himself to the forefront of a public controversy, but rather, was caused to be thrust into the public eye through the tortious conduct of the Defendants as alleged elsewhere herein.

137.  Nonetheless, as the Eleventh Circuit goes on to say in <u>Silvester</u>, "the proper standard for determining whether plaintiffs are limited public figures are best set forth in <u>Waldbaum v. Fairchild Publications, Inc.</u>, 627 F.2d 1287 (D.C. Cir. 1980)." <u>Id.</u>

138.  Under the <u>Waldbaum</u> analysis, the court must "(1) isolate the public controversy, (2) examine the plaintiffs' involvement in the controversy, and (3) determine whether 'the alleged defamation [was] germane to the plaintiffs' participation in the controversy.'" <u>Id.</u> (*citing*, <u>Waldbaum v. Fairchild Publications, Inc.</u>, 627 F.2d 1287, 1297 (D.C. Cir. 1980)).

139.  Under the first prong of the <u>Waldbaum</u> test, a public controversy must be "more than merely newsworthy." <u>Id.</u> (*citing*, <u>Waldbaum</u>, *supra.* 627 F.2d at 1296).

140.  In addition, "the public controversy must not be an essentially private concern such as divorce." <u>Times, Inc. v. Firestone</u>, 424 U.S. 448, 454-55 (1976).

141.   Further, "[i]f it is evident that resolution of the controversy will affect people who do not directly participate in it, the controversy is more than merely newsworthy and if of legitimate public concern." Waldbaum, *supra.* 627 F.2d at 1296.

142.   Finally, "[i]f the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy." Id. at 1297.

143.   With this understanding of "public controversy" in mind, it is clear from the facts that the public controversy in connection with which Plaintiff was defamed by the Defendants was neither "public" nor a "controversy".

144.   For the reasons stated previously, particularly in Count II of this Complaint, the "public controversy" was, in fact, not a matter of public concern, and was rather, a private matter.

145.   This is particularly so given that the subject of the Defendants' defamatory statements was information, the nature of which, was wholly private, intended by Plaintiff to be private, and was password-protected so as to remain private.

146.   Further, the information itself – the Plaintiff's private online browser history – only came into public view as a direct result of the invasion into Plaintiff's reasonable expectation of privacy by the Defendants as alleged elsewhere herein.

147.   Thus, the subject matter of the "public controversy" was most certainly not public.

148.   Nor was the "public controversy", in fact, a controversy at all, as, in light of the findings of the Putnam County Sheriff's Office's report following the forensic

audit of the subject computer, questions like, "Did the Plaintiff utilize the subject computer or Crescent City's municipal network to access adult websites?"; or, Did the Plaintiff cause viruses to infect the Crescent City computers?", were questions that were effectively settled, as the audit revealed, or, if conducted properly, should have revealed, that no, Plaintiff never utilized the subject computer or Crescent City's municipal network to access adult websites, and therefore, could not have possibly caused viruses to infect Crescent City's computers.

149. Further, and perhaps most importantly, the very pretense upon which Defendant Myers directed DeLoach to conduct the forensic audit in the first place, was to determine whether Plaintiff had been accessing the subject computer remotely.

150. The answer to this question was also settled as a result of the audit, which found that, no, Plaintiff was not accessing the subject computer remotely, and that there was no evidence of illegal conduct on Plaintiff's part.

151. Therefore, before the information in connection with which Plaintiff was defamed ever became public through the release of the Sheriff's Office's report to the public, and subsequently to Defendants Cavacini and the Palatka Daily News, the "controversy" had already been settled.

152. With respect to the second prong of the Waldbaum test – the extent to which the plaintiff participated in the public controversy – although it need not be addressed given that there was no "public controversy" as just explained, if we assume *arguendo* that a public controversy did exist, it is clear from the facts that the Plaintiff does not satisfy this prong, as to satisfy this second Waldbaum prong, "the plaintiff

either (1) must 'purposely [try] to influence the outcome of' the public controversy, or (2) 'could realistically have been expected, because of his position in the controversy, to have an impact on its resolution.'" <u>Silvester</u>, *supra.* 839 F.2d at 1496 (citing, <u>Waldbaum</u>, *supra.* at 627 F.2d at 1297).

153.   Plaintiff did not and could not attempt to influence the outcome of the public controversy, nor could he realistically have been expected to have an impact on its resolution because again, the "controversy" was already resolved by the time the Defendants' defamatory statements were made.

154.   Finally, with respect to the third prong of the <u>Waldbaum</u> test – whether the alleged defamation was germane to Plaintiff's participation in the controversy – this prong – again, as the "controversy" had already been resolved by the time the Defendants' defamatory statements were made – Plaintiff does not satisfy this prong either.

155.   Therefore, as none of the prongs of the <u>Waldbaum</u> test are satisfied, Plaintiff is clearly not a limited public figure.

156.   Nor, however, is Plaintiff an all-purpose public figure, for neither at the time the Defendants' defamatory statements were made did Plaintiff possess, nor at present does Plaintiff possess, a position "of such persuasive power and influence" that he is deemed a public figure for all purposes. <u>Gertz</u>, *supra.* 418 U.S. at 345.

157.   Therefore, with respect to assessing the liability of the Defendants for defamation, Plaintiff is most certainly a private figure.

<u>The Defamatory Statements & Actual Malice</u>

158.    Even despite the foregoing which illustrates that Plaintiff is a private figure with respect to the instant defamation claim, if we assume *arguendo* that Plaintiff is either a public figure or limited public figure with respect to the Defendants' false and defamatory statements, Plaintiff must prove the Defendants acted with actual malice.

159.    Actual malice is established by showing that the publication was made with knowledge that it was false or with reckless disregard of whether it was false or not. Hoch v. Rissman, Weisberg, Barrett, 742 So.2d 451, 460 (Fla. 5th DCA 1999), rev. denied, 760 So.2d 948 (Fla. 2000). *See also*, Scholz v. RDV Sports, Inc., 710 So.2d 618, 626 (Fla. 5th DCA 1998), rev. denied, 718 So.2d 170 (Fla. 1998).

160.    The false and defamatory statements of the Defendants are stated within Defendant Cavacini's article.

161.    Cavacini writes, "The Putnam County Sherrif's Office conducted an audit in early April because interim City Manager Phil Leary and Mayor Michele Myers, who currently uses the computer [Plaintiff] previously used, were worried 'confidential information was being accessed off the mayor's work computer and then leaked.'" (**Ex. "B"**).

162.    Cavacini goes on to write that, "Additionally, there was concern that they had discovered links to adult websites and accounts with passwords associated with the former Mayor [the Plaintiff]."

163.    Although the article goes on to say that, based upon the findings of the forensic audit, "The sheriff's office report did not find any evidence of illegal activities

involving Myer's computer that Peterson... used during his time in office," which may perhaps be responsive to the "worry" referenced earlier in the article that "confidential information was being accessed off the mayor's work computer and then leaked," the article never goes on to explicitly state this, despite the Defendants all having evidence – the forensic audit report – that would have definitively answered this question and exculpated Plaintiff with respect to the allegation.

164.    Further, Defendant Cavacini's article is primarily considered about the possibility of Plaintiff having accessed adult sites from the subject computer, but never actually states that Plaintiff did not, in fact, access adult sites from the subject computer, despite the Defendants all having evidence – the forensic audit report – that would have definitively answered this question and exculpated Plaintiff with respect to the allegation.

165.    These defamatory claims are not simply libelous on the part of Defendant Cavacini and the Palatka Daily News, but they are also defamatory on the parts of Defendants Myers, Sharp, and DeLoach, whose subjective thoughts and objective findings contributed to both the article and the forensic report upon which the article was based.

166.    None of the Defendants can rightfully seek to claim the defense that the statements expressed in Defendant Cavacini's article as well as the article itself were solely statements of opinion, which would not be actional as defamation under Florida law. Morse v. Ripken, 707 So.2d 921, 922 (Fla. 4th DCA 1998).

167.    This is because the statements were mixed expressions of fact and

opinion, made by the Defendants "based upon facts regarding the plaintiff or his conduct that have not been stated in the article or assumed to exist by the parties to the communication," <u>From v. Tallahassee Democrat, Inc.</u>, 400 So.2d 53, 57 (Fla. 1st DCA 1981), and further, because they "imply the existence of undisclosed defamatory facts as [their] basis." <u>LXR, Inc. v. Horizon Assocs. Joint Venture</u>, 842 So.2d 881, 885 (Fla. 4th DCA 2003).

168.   Additionally, "if the 'facts' upon which the opinion is based are stated in the article, but those 'facts' are either incomplete or incorrect, or the speaker's assessment of them is erroneous, the statement may imply a false assertion of fact. In that event, the statement is not protected as pure opinion." <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1, 18-19 (1990).

169.   Here, it is very clearly the case, that the 'facts' – Defendants Myers and DeLoach subjective thoughts and objective findings as related both in the forensic report and Defendant Cavacini's article which was based upon said report – were woefully incomplete so as to imply a false assertion of fact – that Plaintiff looked at porn on his work computer, when this is, in fact, not so.

170.   Although whether an alleged defamatory statement consists of mixed opinion and fact is a question of law for the Court (<u>Colodny v. Iverson, Yoakum, Papiano & Hatch</u>, 936 F.Supp. 917, 923 (M.D. Fla. 1996)), "[w]here the court finds that the statements in question is of mixed opinion and fact and reasonably capable of defamatory interpretation, then a jury issue is presented." <u>Stembridge v. Mintz</u>, 652 So.2d 444, 446 (Fla. 3d DCA 1995).

171.    Further evidence of that the incomplete or incorrect statements of the Defendants are reasonably capable of defamatory interpretation is the fact that is clear that these statements were made with actual malice by each and every Defendant.

172.    Recall again that actual malice is established by showing that the publication was made with knowledge that it was false or with reckless disregard of whether it was false or not. Hoch, *supra.* 742 So.2d at 460.

173.    The Defendants all had actual knowledge that their incomplete or incorrect statements were factually false and were such that they were reasonably capable of defamatory interpretation.

174.    This knowledge came by virtue of the fact that the Defendants all possessed the findings of the forensic audit of the subject computer which revealed that the allegations levied against Plaintiff vis-à-vis the "links to adult websites and accounts with passwords associated with [Plaintiff]" having been discovered on the subject computer – the allegations that precipitated the audit and were subsequently published in Defendant Cavacini's article – were all blatantly false and unfounded.

175.    In short, the Sheriff's Office's report of the findings of the forensic audit which the Defendants all possessed, fully exonerated Plaintiff with respect to all of the allegations of his wrongful, illegal, or unethical conduct on the subject computer, but Defendant's article and the facts and opinions of the Defendants which comprise it do not make that fact clear to the public, which perhaps was the intended effect from the beginning.

176.    Thus, the Defendants all made their incomplete or incorrect statements

about Plaintiff's conduct – statements reasonably capable of defamatory interpretation – with actual malice, having actual knowledge that it their incomplete or incorrect statements were false when they were made, or at the very least, the statements were communicated by each Defendant with reckless disregard of whether the statements were false or not.

177.   As this relates to the element of fault with respect to defamation, recall again that "the appropriate standard after *Gertz* is negligence – i.e., publication of false and defamatory statements without reasonable care to determine their falsity." Boyles v. Mid-Florida Television Corp., 431 So.2d 627, 634 (Fla. 5th DCA 1983), affirmed, 467 So.2d 282 (Fla. 1985).

178.   As has been made clear in this discussion of actual malice, the Defendants each failed to exercise due reasonable care, not only in determining the falsity and incomplete nature of their defamatory statements but failed further to refrain from publishing to third-parties the false and defamatory statements they knew to be incorrect or incomplete depictions of 'fact'.

179.   Having breach this duty of reasonable care to refrain from publishing to third-parties the false and defamatory statements they knew to be incorrect or incomplete depictions of 'fact', the Defendants all acted negligently, as alleged.

180.   As a direct and proximate result of the tortious conduct of Defendants Myers, Sharp, DeLoach, Cavacini, and the Palatka Daily News, as alleged, these Defendants have defamed Plaintiff with respect to the public, thereby causing Plaintiff to suffered actual damages, including reputational injury, as a result.

## COUNT V
## 42 U.S.C. § 1983 – UNREASONABLE SEARCH AND SEIZURE
### U.S. Const. Amend. IV
### (Defendants Michele Myers, Alex Sharp, H.D. DeLoach, and the City of Crescent City)

181.   Plaintiff, BRETT PETERSON, repeats and reavers each and every allegation of paragraphs 1 through 60 as though fully set forth herein.

182.   42 U.S. 42 U.S. § 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

183.   Defendants Myers, Sharp, DeLoach, and the City of Crescent City are all "persons" within the meaning of 42 U.S. 42 U.S. § 1983.

184.   The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

185.   The Due Process Clause of the Fourteenth Amendment incorporates these Fourth Amendment rights as against the states.

186.   The Fourth Amendment's protections extend to "any thing or place with respect to which a person has a 'reasonable expectation of privacy'." California v. Ciraolo, 476 U.S. 207, 211 (1967).

187.   Whether an individual has a reasonable expectation of privacy in the

object of the challenged search is a two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of the challenged search, and second, is society willing to recognize that expectation as reasonable? Id. (citing generally, Katz v. United States, 389 U.S. 347 (1967)).

188.    Therefore, "a party alleging an unconstitutional search under the Fourth Amendment must establish *both* a subjective *and* an objective expectation of privacy to succeed." United States v. Robinson, 62 F.3d 1325, 1328 (11th Cir. 1995).

189.    The subjective component of the reasonable expectation of privacy analysis requires that a person "exhibit an actual expectation of privacy". Id.

190.    Here, it is very clear that Plaintiff exhibited an actual expectation of privacy with respect to his Google Account, his various other online accounts, and his private internet browser history as all of this digital content was password-protected and was therefore only intended to be accessible by Plaintiff.

191.    Regarding the objective component of the reasonable expectation of privacy analysis, this component requires that "'the [privacy] expectation be one that society is prepared to recognize as 'reasonable'." United States v. Ford, 34 F.3d 992, 995 (11th Cir. 1994) (*citing*, Katz, *supra.* 389 U.S. at 361).

192.    In determining this, "[u]nder the objective prong, the proper inquiry is whether the 'government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment'." Id. at 996, (*citing*, Oliver v. United States, 466 U.S. 170, 182-83 (1984)).

193.    Here, the Defendants Michele Myers, Sharp, and DeLoach, while acting

under color of state law and on behalf of Defendant the City of Crescent City, employed sophisticated forms of technological surveillance in the form of a forensic audit on the subject computer, to unlawfully and without a warrant, intrude into Plaintiff's private online quarters.

194.   In determining whether the governmental was so intrusive so as to be objectively unconstitutional, "[T]he mere fact that the [governmental actors] have employed relatively sophisticated forms of technological surveillance does not render the surveillance unconstitutional... The crucial inquiry, as in any search and seizure analysis, is whether the technology reveals 'intimate details'." Robinson, *supra.* 62 F.3d at 1329, (*citing*, U.S. v. Ishmael, 48 F.3d 850 (5th Cir. 1995)).

195.   Here, the technology employed by the Defendants named in this Count very clearly revealed intimate details including, "a Microsoft Excel spreadsheet that listed websites, usernames and passwords that were associated with [Plaintiff]" as well as the contents of the private browser history associated with Plaintiff's Google Account.

196.   The Supreme Court of the United States has "long recognized that the Fourth Amendment's guarantee of freedom from warrantless search and seizures is not premised on arcane concepts of property and possessory interests," but rather, "protects an individual in those places where [he] can demonstrate a reasonable expectation of privacy against government intrusion." U.S. Cooper, 203 F.3d 1279, 1283-84 (11th Cir. 2000).

197.   As has been established here, Plaintiff most certainly had a reasonable

expectation of privacy with respect to his online content as described, as his expectation thereto was both subjectively and objectively reasonable per *Katz*, and further, the fact that the search into and the seizure of Plaintiff's highly sensitive and highly private online content was conducted wholly without a warrant in further violation of the Fourth Amendment, makes the unlawful, offensive, and exploitative conduct of the herein named Defendants all the more egregious.

198.   Thus, the Defendants named in this Count have all, while acting under color of state law, deprived the Plaintiff, in bad faith and with malicious purpose, of his constitutionally-protected rights as arising under the Fourth Amendment to the United States Constitution.

199.   This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983, and in addition to damages in connection with this violation, Plaintiff further seeks reasonable attorney's fees and costs of suit pursuant to 42 U.S.C. § 1988.

<u>COUNT VI</u>
<u>42 U.S.C. § 1985(3) – CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS</u>
**U.S. Const. Amend. IV**
**(Defendants Michele Myers, Sharp, and H.D. DeLoach)**

200.   Plaintiff, BRETT PETERSON, repeats and reavers each and every allegation of paragraphs 1 through 60 and 181 through 199, as though fully set forth herein.

201.   The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

seizures." U.S. Const. amend. IV.

202.   The Due Process Clause of the Fourteenth Amendment incorporates these Fourth Amendment rights as against the states.

203.   42 U.S.C. § 1985(3) provides, in relevant part that:

> If two or more persons in any State or Territory conspire…
> for the purpose of depriving, either directly or indirectly,
> any person or class of persons of the equal protection of the
> laws, or of equal privileges and immunities under the laws…
> if one or more persons engaged therein do, or cause to be
> done, any act in furtherance of the object of such
> conspiracy, whereby another is injured in his person or
> property, or deprived of having and exercising any right or
> privilege of a citizen of the United States, the party so
> injured or deprived may have an action for the recovery of
> damages occasioned by such injury or deprivation, against
> any one or more of the conspirators.

204.   Therefore, "[t]o state a successful claim, [under 42 U.S.C. § 1985(3),] a plaintiff must prove: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." Park v. City of Atlanta, 120 F.3d 1157, 1161 (11th Cir. 1997).

205.   Defendants Myers, Sharp, and DeLoach have so conspired as against Plaintiff.

206.   Specifically, Defendants Myers, Sharp, and DeLoach conspired for the purpose of depriving, either directly or indirectly, Plaintiff of the equal protections of

the laws, or of his equal privileges and immunities, as arising under the Fourth Amendment to the United States Constitution.

207.   The specific acts of Defendants Myers, Sharp, and DeLoach in furtherance of this conspiracy are outlined in detail elsewhere herein, for example, in the Facts Common to All Counts and the allegations of Count V, which are specifically incorporated by reference here.

208.   As a result of the conspiracy between Defendants Myers, Sharp, and DeLoach and their individual and collective acts in furtherance thereof, Plaintiff was deprived of his constitutional right to equal protection of law, or of his equal privileges and immunities, specifically, as arising under the Fourth Amendment to the United States Constitution.

209.   This conspiracy to interfere with the Plaintiff's civil rights is actionable under and may be redressed by 42 U.S.C. § 1985, and in addition to damages in connection with this violation, Plaintiff further seeks reasonable attorney's fees and costs of suit pursuant to 42 U.S.C. § 1988.

**COUNT VII**
**DEPRIVATION OF EQUAL PROTECTION**
***MONELL* CLAIM – MUNICIPAL LIABILITY**
**U.S. Const. Amend. XIV**
**(The City of Crescent City)**

210.   Plaintiff, BRETT PETERSON, repeats and reavers each and every allegation of paragraphs 1 through 60 as though fully set forth herein.

211.   42 U.S. 42 U.S. § 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance,

> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected,
> any citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and
> laws, shall be liable to the party injured in an action at law,
> suit in equity, or other proper proceeding for redress...

212.    The City of Crescent City is a "person" within the meaning of 42 U.S. 42

U.S. § 1983. ("Congress *did* intend municipalities and other local government units to

be included among those persons to whom § 1983 applies.") Monell v. Department of

Social Services of City of New York, 436 U.S. 658, 690 (1978).

213.    Under the Fourteenth Amendment to the Constitution of the United

States, Plaintiff had the right as a citizen of the United States to equal protection under

the law. This includes Plaintiff's right "to be secure in [his] persons, houses, papers,

and effects, against unreasonable searches and seizures," as arising under the Fourth

Amendment to the Constitution of the United States.

214.    While a municipality cannot be held liable under § 1983 on a theory of

*respondeat superior*, they may, nevertheless, be held liable for execution of a

governmental policy or custom. Id. at 690-91.

215.    Therefore, to establish municipal liability under § 1983, a plaintiff must

demonstrate (1) a constitutional violation by a municipal actor (2) that was caused by

a governmental policy or custom. Id. at 694.

216.    With respect to this first requirement – that Plaintiff demonstrate a

constitutional violation – Plaintiff has adequately demonstrated an unconstitutional

violation of the rights and privileges secured to him by the Fourth Amendment to the

Constitution of the United States, specifically, in Count V of this Complaint.

217.    Therefore, to maintain a claim under <u>Monell</u>, Plaintiff must further demonstrate that this constitutional violation was caused by a governmental policy or custom.

218.    To that end, it is clear that a municipality's legislative action constitutes governmental policy. "No one has ever doubted... that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body – whether or not that body had taken similar action in the past or intended to do so in the future – because even a single decision by such a body unquestionably constitutes an act of official government policy." <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 480 (1986).

219.    Likewise, if the legislative body delegates authority to a municipal official, agency, or board, an action by such an official, agency, or board also constitutes government policy. <u>Monell</u>, *supra.* 436 U.S. at 660-61 & n.2.

220.    The legislative body of the State of Florida has delegated authority to local officials, specifically, pursuant to Title XII "Municipalities" of the *Florida Statutes Annotated*, (*see*, Chapter 165 "Formation of Local Governments").

221.    Pursuant to this authority, the City Charter for the City of Crescent City, specifically at Art. I "Form of Government and Powers", § 1.03 "Powers" provides that:

> The city shall have governmental, corporate, and proprietary powers to enable it to conduct municipal government, perform municipal functions, and render municipal services, and may exercise any power for municipal purposes except when expressly prohibited by

law.

222.     A municipality's legislative body, such as a City Commission (which, coincidently Defendant Michele Myers, as mayor of Crescent City, is a member of and presides over as Mayor-Commissioner), will often wield the "power to establish policy", which matters for <u>Monell</u> purposes, because "<u>Monell's</u> language makes clear that it expressly envisioned other officials 'whose acts or edicts may fairly be said to represent official policy,'" including, for example, a mayor. <u>Pembaur</u>, *supra.* 475 U.S. at 480.

223.     Therefore, pursuant to the powers and authorities delegated to her by the legislature of the State of Florida, Defendant Myers, as mayor of Crescent City, while acting under color of state law, herself engaged in, and further, directed the Putnam County Sheriff's Office, and specifically, Defendant H.D. DeLoach (hereinafter, "DeLoach") to engage in, conduct which violated the rights and privileges secured to Plaintiff by the Fourth Amendment to the Constitution of the United States.

224.     Thus, the violative and unconstitutional conduct of Defendant Myers, as mayor of Crescent City, while acting under color of state law, and pursuant to the powers and authorities delegated to her by the legislature of the State of Florida, were "acts or edicts [which] may fairly be said to represent official policy" of Defendant the City of Crescent City.

225.     Defendant Myers, as mayor of Crescent City, ordered, approved of, and/or ratified the tortious acts or edicts which may fairly be said to represent official policy of Defendant the City of Crescent City.

226.    As has been made clear elsewhere herein, this official policy and the tortious acts which underlie it, were the moving force behind the violations of the Plaintiff's Fourth Amendment constitutional rights as alleged.

227.    This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983, and in addition to damages in connection with this violation, Plaintiff further seeks reasonable attorney's fees and costs of suit pursuant to 42 U.S.C. § 1988.

## COUNT VIII
## VIOLATIONS OF THE STORED COMMUNICATIONS ACT (SCA)
### 18 U.S.C. § 2701 et seq.
### (Michele Myers, Alex Sharp, H.D. DeLoach, and the City of Crescent City)

228.    Plaintiff, BRETT PETERSON, repeats and reavers each and every allegation of paragraphs 1 through 60 as though fully set forth herein.

229.    The Stored Communications Act ("SCA" or "the Act"), codified at 18 U.S.C. §§ 2701-2713, protects electronic communications in storage, and provides, in relevant part that, "whoever intentionally accesses without authorization a facility through which an electronic communication service is provides; or... intentionally exceeds an authorization to access that facility; and thereby obtains... access to a wire or electronic communication while it is in electronic storage in such system" is liable pursuant to the SCA. 18 U.S.C. §§ 2701(a). *See also*, Brown Jordan International, Inc. v. Carmicle, 846 F.3d 1167 (11th Cir. 2017).

230.    "Electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic

communications." <u>Vista Marketing, LLC v. Burkett</u>, 812 F.3d 954, 962 (11th Cir. 2016) (citing, 18 U.S.C. § 2510(15)).

231.    Regarding the term "electronic storage," it is defined as follows:

a.    Any temporary, intermediate storage of wire or electronic communication incidental to the electronic transmission thereof; and

b.    Any storage of such communication by an electronic communication service for purposes of backup protection of such communication.

*Id.* at 963 (citing, 18 U.S.C. § 2510(17)).

232.    The SCA allows for private causes of action where "any person" injured by a violation of the SCA can show that the person violating the Act acted with a "knowing or intentional state of mind[.]" 18 U.S.C. § 2707(a).

233.    The matter of <u>Brown Jordan International, Inc. v. Carmicle</u>, 846 F.3d 1167 (11th Cir. 2017), is illustrative in the present case.

234.    Put simply, in <u>Carmicle</u>, the company for which the defendant in that matter – Carmicle – worked, was in the process of transitioning from one email service provider to another. To assist in that process, the company's Chief Information Officer provided a generic password – "Password1" – to all employees and instructed each to test his or her new email account with that password.

235.    Carmicle repeatedly accessed the email accounts of other employees, including his superiors, with the generic password and used his personal iPad to take screenshots of hundreds of emails over a period of six months.

236.    Among other defenses, Carmicle contended that he did not violate the

SCA because his email access was authorized by virtue of the company's policy which provided, among other things, that "employees at [the company] should have no expectation of privacy while using company-owned or company-leased equipment."

237.   The 11th Circuit Court of Appeals found this argument unpersuasive and determined that Carmicle's access of other employees' email was unauthorized.

238.   Given the facts of the instant matter, and with the Carmicle decision in mind, it is even more clear that the conduct of the Defendants named in this Count violated the SCA.

239.   First, Carmicle was found to have violated the SCA in the private sector where the freedom of individuals to contract, especially with respect to the employer-employee relationship, is paramount.

240.   Here, the Defendants named in this count were governmental actors, and thus, their intrusions into Plaintiff's stored electronic communications were particularly egregious as they were constitutional violations, in addition to being tortious and violation of the SCA.

241.   Specifically, Defendant Michele Myers had unauthorized access to Plaintiff's entire Google Account – providing her access to such things as Plaintiff's emails, Google Drive, and private browser history – for a period of six months, during which time she compiled a spreadsheet listing the usernames and passwords of Plaintiff's various online accounts.

242.   Admittedly, it is unknown whether Defendant Myers opened and/or read any of Plaintiff's emails, but she undoubtedly has the access to do so for a period

of six months, and therefore, could easily have deleted any emails she read so as to prevent Plaintiff from finding out.

243.   Further, Defendant Myers, as mayor of Crescent City, directed Defendants Sharp and DeLoach of the Putnam County Sheriff's Office, to conduct a forensic audit on the subject computer formerly used by Plaintiff, and thereby intruded further into Plaintiff's Google Account by accessing Plaintiff's private internet browser history.

244.   These actions the Defendants were clearly not accidental and were performed with a "knowing or intentional state of mind[.]" 18 U.S.C. § 2707(a).

245.   Therefore, the Defendants named in this Count have, individually, and collectively, violated the SCA by knowingly and intentionally accessing, without authorization in that the access was performed without Plaintiff's consent and not pursuant to a warrant, a facility through which an electronic communication service is provided – Plaintiff's Google Account – and thereby obtaining access to Plaintiff's electronic communication stored therein.

246.   As such, the Defendants are liable to Plaintiff under the SCA not only for damages pursuant to 18 U.S.C. § 2707(c), but for reasonable attorney's fees and litigation costs pursuant to 18 U.S.C. § 2707(b).

### COUNT IX
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
**Common Law**
**(All Defendants)**

247.   Plaintiff, BRETT PETERSON, repeats and reavers each and every

allegation of paragraphs 1 through 60 as though fully set forth herein.

248.   All Defendants herein named in this Complaint, have intentionally inflicted severe emotional distress upon the Plaintiff.

249.   Under Florida law, the elements of a cause of action for the intentional infliction of emotional distress are:

1.  the wrongdoer's conduct was intentional or reckless, *i.e.,* he intended his behavior when he knew or should have known that emotional distress would likely result;

2.  the conduct was outrageous, *i.e.,* beyond all bounds of decency, atrocious and utterly intolerable in a civilized community;

3.  the conduct caused emotional distress; and

4.  the emotional distress was severe.

State Farm Mut. Auto Ins. Co. v. Novotny, 657 So.2d 1210 (Fla. 5th DCA 1995).

250.   All Defendants knew or should have known that their respective conduct as alleged herein would likely result in emotional distress to the Plaintiff.

251.   With respect to Defendants Myers, Sharp, DeLoach, and the City of Crescent City, in tortiously invading into the private online quarters of Plaintiff by accessing, without his knowledge or consent, Plaintiff's Google Account and the private browser history of Plaintiff as associated therewith, these Defendants knew or should have known that this conduct, if it were to be discovered by Plaintiff, would likely result in emotional distress to Plaintiff.

252.   Further, with respect to Defendants Myers, Sharp, DeLoach and the City of Crescent City, these Defendants knew or should have known that then proceeding to release the findings of the forensic audit on the subject computer to the public – the findings of which included highly sensitive intimate details about Plaintiff's private online browsing history – especially such that it could be reported on in the media, would likely result in emotional distress to Plaintiff.

253.   Further, with respect to Defendants Cavacini and Palatka Daily News, the act of these Defendants proceeding to author and publish, respectively, an article in a newspaper – both in print and online – in general publication, which contained incomplete and incorrect statements that could imply false assertions of fact about the Plaintiff and serve to defame him and place him in a false light in the eyes of the public, is conduct which these Defendants knew or should have known would likely result in emotional distress to Plaintiff.

254.   Therefore, all Defendants engaged in conduct which they knew or should have known would likely result in emotional distress to Plaintiff.

255.   The conduct of all Defendants, as alleged, was so outrageous in character and so extreme in degree as to go beyond the bounds of decency and to be deemed utterly intolerable in a civilized community, as it would surely arouse resentment in an average member of the Plaintiff's community and cause him or her to exclaim "outrageous." Id. at 1212-13. *See also*, Metropolitan Life Ins. Co. v. McCarson, 467 So.2d 277 (Fla. 1985).

256.   Further, the conduct of all Defendants, as alleged, did, in fact, result in

emotional distress to Plaintiff and said emotional distress was severe.

257.   Therefore, as a direct and proximate result of the conduct of all Defendants, as alleged, all Defendants have intentionally inflicted emotional distress upon the Plaintiff, resulting in Plaintiff sustaining damages.

## COUNT X
## NEGLIGENCE
### Common Law
### (All Defendants)

258.   Plaintiff, BRETT PETERSON, repeats and reavers each and every allegation of paragraphs 1 through 60 as though fully set forth herein.

259.   Under Florida law, for a plaintiff to bring a claim for negligence, the plaintiff bears the burden of proving all four elements of negligence: 1) a duty of care; 2) breach of that duty; 3) causation; and 4) damages.

260.   All Defendants owed Plaintiff a duty of due reasonable care.

261.   Specifically, Defendants Myers, Sharp, DeLoach, and the City of Crescent City owed Plaintiff a duty as governmental actors to refrain from infringing on Plaintiff's constitutionally-protected rights, privileges, or immunities, for example, by seeking and obtaining a warrant before conducting a search into and seizure of Plaintiff's private online content and then releasing the findings thereof to the public.

262.   Defendants Myers, Sharp, DeLoach, and the City of Crescent City have, individually and collectively, breached the duty of reasonable care they owed Plaintiff by way of their tortious conduct as alleged elsewhere herein.

263.   Similarly, Defendants Cavacini and Palatka Daily News, as a reporter

and newspaper publisher/publication, respectively, owed Plaintiff a duty to report insofar as it relates to Plaintiff as its subject in a manner that was reasonably accurate and fair, so as to not defame Plaintiff or place him in a false light.

264.   Defendants Cavacini and the Palatka Daily News have, individually and collectively, breached the duty of reasonable care they owed Plaintiff by way of their tortious conduct as alleged elsewhere herein.

265.   It is reasonably foreseeable that an individual similarly situated to the Plaintiff could be harmed as a result of unconstitutional governmental intrusion into their private affairs on the internet, for example, by conducting a warrantless search into and seizure of their private online content and then releasing the findings thereof to the public.

266.   It is also reasonably foreseeable that an individual similarly situated to the Plaintiff could be harmed as a result of journalism, of which they were the subject, that was neither reasonably accurate nor fair, and served to defame them and place them in a false light in the eyes of the public.

267.   Therefore, the respective failures of all Defendants, through their errors, omissions, and/or negligent conduct as alleged herein, were both the actual and proximate cause of the damages which Plaintiff did, in fact, sustain.

**COUNT XI**
**TORTIOUS CONDUCT OF FICTITIOUS DEFENDANTS**
**Common Law**
**(Defendants John/Jane Does 1-10 and ABC Entities 1-10)**

268.   Plaintiff, BRETT PETERSON, repeats and reavers each and every

allegation of paragraphs 1 through 60 as though fully set forth herein.

269.   At all times relevant to this action, Defendants John/Jane Does 1-10 and ABC Entities 1-10, are fictitious names for Defendants and entities whose identities are unknown at present, but who constitute persons, partnerships, joint ventures, corporations, associations, or other entities, whether public or private, the identities of which are unknown at present, but who participated in the tortious actions of the Defendants described herein, or engaged in their own tortious conduct with respect to the Plaintiff, and in other ways as yet undetermined.

270.   As a direct and proximate results of the negligence and/or tortious conduct of Defendants John/Jane Does 1-10 and ABC Entities 1-10, Plaintiff has been caused to suffer, and in fact did suffer, significant damages.

271.   Plaintiff alleges an insufficient opportunity to determine the identity of all individuals or entities whose actions or omissions may be potentially responsible in whole or in part for the damages incurred by Plaintiff.

272.   As such, Plaintiff specifically reserves the right to name additional individuals or entities as Defendants to this action, when and if their identities become known to Plaintiff.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

    a.  Awarding the Plaintiff compensatory and punitive damages against all Defendants as to all Counts;

    b.  Awarding Plaintiff statutory damages as to Count VIII pursuant to 18 U.S.C. § 2707(c);

c.  Awarding Plaintiff his reasonable attorneys' fees, litigation expenses, and costs incurred in connection with this action from Defendants pursuant to 42 U.S.C. § 1988 or pursuant to 18 U.S.C. § 2707(b); and

d.  Awarding all other relief that this Court deems just and proper.

Respectfully Submitted,

Dated: 01/25/2022

_____
ROOK ELIZABETH RINGER, ESQ.
Florida Bar No. 1015698
LENTO LAW GROUP, P.A.
222 San Marco Ave., Ste. C
St. Augustine, FL 32084
904.602.9400 (Office)
904.299.5400 (Fax)
reringer@lentolawgroup.com
*Attorney for Plaintiff*
TRIAL COUNSEL

_____
JOSEPH D. LENTO, ESQ.
(*Pro Hac Vice* to be applied for)
LENTO LAW GROUP, P.A.
1500 Market Street – 12th Floor
East Tower
Philadelphia, PA 19106
267.833.0200 (Office)
267.833.0300 (Fax)
jdlento@lentolawgroup.com
*Attorney for Plaintiff*
TRIAL COUNSEL